**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|                                           |     |                                  |
|-------------------------------------------|-----|----------------------------------|
| **RONALD DEMARCO,**                       | )   |                                  |
|                                           | )   |                                  |
| **Plaintiff,**                            | )   |                                  |
|                                           | )   |                                  |
| **v.**                                    | )   | **Case No. 06 C 0121**           |
|                                           | )   |                                  |
| **MICHAEL J. ASTRUE,**                    | )   | **Magistrate Judge Nan R. Nolan** |
| **Commissioner of Social Security,**      | )   |                                  |
|                                           | )   |                                  |
| **Defendant.**[1]                         | )   |                                  |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ronald Demarco seeks judicial review of the final decision of the Defendant Commissioner of Social Security finding Demarco not disabled. Cross motions for summary judgment are pending. For the reasons stated below, Plaintiff's Motion for Summary Judgment [20] is denied and Defendant's Motion for Summary Judgment [22] is granted.

**I.      Procedural History**

On July 10, 2000, Demarco applied for Disability Insurance Benefits, alleging he became disabled on December 5, 1997 due to lower back pain and arthritis in his hands. (Tr. 66-68, 86). Demarco's insured status for DIB purposes expired on September 30, 2002. Demarco had to show that he was disabled on or before that date. On October 5, 2000, the SSA denied Demarco's claim for benefits, finding he retained the ability to

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is automatically substituted as the Defendant in this action.

perform light work. (R. 40-43). On November 27, 2002, Demarco filed a second application for Disability Insurance Benefits. (R. 75-77). On February 5, 2003, the SSA denied Demarco's claim for disability benefits, explaining that the medical reports in the record by Dr. Harb Boury, Dr. Manuel Blas, and Central DuPage Hospital did not show that Demarco was disabled. (R. 44-48). On February 14, 2003, Demarco filed a Request for Reconsideration, which was denied on March 12, 2003. (R. 49-54). On March 25, 2003, Demarco filed a Request For Hearing By Administrative Law Judge. (R. 55-56). On October 25, 2004, the ALJ issued a decision finding Demarco not disabled and denying his request for Disability Insurance Benefits. (R. 27-36). Demarco filed a Request for Review of the ALJ's decision denying his claim for benefits. (R. 15-17). On November 15, 2005, the Appeals Council denied Demarco's request for review. (R. 5-8).

## II.    Factual Background

### A.    Background and Demarco's Testimony

Demarco was born on August 4, 1952 and was 52 years old at the time of the hearing. (R. 297). Demarco completed ninth grade. (R. 297). It is unclear whether Demarco earned a GED. (R. 92, 113, 298). Demarco previously worked as a truck driver for a trucking company between 1979 and 1996. (Tr. 87, 131, 133, 301). Between 1996 and 2002, he was self employed repairing lawn mower engines and also worked for a company plowing snow. (R. 108, 116, 131, 298-300).

In December 1994, Demarco injured his back while working for the trucking company. (R. 301-02). He returned to work on light duty and was then fired in April 1996. (R. 303-04). In a report dated July 9, 2000, Demarco stated he had constant back pain and

arthritis in his hands. (Tr. 86). He listed his current medications as Codeine and muscle relaxers for back pain and Valium to help sleep and pain relief. (Tr. 91). He also indicated that the Codeine made him sleepy. Id.

On July 24, 2000, Demarco reported that he cannot sit, stand, stoop, or walk for more than 15 minutes at time. (R. 103). He also stated that on a scale of 1-10, his pain is at a constant level 4 and increases to a 7-10 if he does small tasks. Id. On July 10, 2000, an SSA employee reported observing Demarco having difficulty sitting and walking during his initial interview. (Tr. 97). On his February 13, 2002 Reconsideration Disability Report, Demarco reported experiencing more pain in his back. (R. 139). On August 1, 2002, an SSA employee reported observing no degree of limitation related to Demarco's alleged disability. (R. 123). On August 12, 2002, Demarco stated he had constant pain and reported taking Soma compound for back spasms, Oxycontin for pain, Valium for pain and to help sleep, Zanaflex for back spasms, and Percocet for pain. (R. 112, 114).

On December 23, 2002, Demarco completed a Activities of Daily Living Questionnaire. (R. 125-27). Demarco stated that if he stays in the same position for more than 10-15 minutes, he starts to experience severe back pain. (R. 125, 127). He indicated that he cannot bend or stoop due to pain and back spasms. Id. Demarco also stated that his son carries bags, groceries, and baskets of laundry, takes out the trash, and does yard work. (R. 125, 127). Demarco reported that he avoids reaching overhead or above waist level because it brings on immediate pain and back spasms. Id. He explained that he cannot sit for at least 2 hours because he needs to reposition after 10-15 minutes. (R. 126).

At the August 19, 2004 hearing, Demarco testified that his back hurts "big time." (R. 305). He further testified that he has lost a substantial amount of strength in his right hand and gets shooting pain through the right elbow. (R. 305-06). Demarco stated that he might be able to walk a block but cannot walk two blocks and cannot go shopping. (R. 307, 323). Demarco can stand and sit longer when taking his pain medications than when not taking his medications. (R. 307-08). Demarco testified that he cannot sit for a full, eight-hour day even with periodically standing up during the day. (R. 327). Demarco also stated that he could not stand for two hours consistently out of an eight-hour workday. Id. He also does not believe he can walk for two hours out of an eight-hour workday. Id.

On June 23, 2004, Demarco reported taking the following medications: Oxycontin, Celebrex, Valium, Soma compound, and Naproxen. (R. 147). At the hearing, Demarco confirmed that he was taking the same medications. (R. 308). Demarco testified that the Oxycontin blurs his vision, makes it hard for him to walk, and reduces his concentration. (R. 308). Demarco described feeling like a zombie when on Oxycontin and added that he cannot drive when taking it. (R. 309, 317). Demarco stated that the Oxycontin and Valium make him sleepy. (R. 320-21). Demarco takes the Valium with the Oxycontin three to four times a week and then often sleeps two to three hours during the day. (R. 321-22). Demarco also reported trouble sleeping. (R. 309).

Demarco stated that he cannot bend at the waist and cannot tie his shoes. (R. 318-19). Demarco indicated that when he worked full-time at his lawn mower repair business, he would have to crawl up the stairs at night because he was in so much pain. (R. 317-18). Demarco described his pain level as a constant seven on a scale of 1 to 10 which also sometimes increasesto a 10. (R. 313). Demarco can drive a car and go to the store alone.

(R. 311-12).  He cuts with grass with a riding mower.  (R. 312).  Demarco testified that he cannot reach with his right arm.  (R. 319).  To relieve his pain, Demarco needs to lay on the couch on an angle and sleep.  Id.

### B.    Medical Evidence

On January 4, 1995, Dr. Robert Uteg examined Demarco.  (R. 202-03).  Demarco reported injuring his back on December 3, 1994 when he lifted a rear door of a trailer and it became stuck.  (R. 202).  Dr. Uteg's impression was lumbar musculoligamenous strain.  (R. 203).  He recommended Demarco continue physical therapy, resume taking Naprosyn, and then be reevaluated.  Id.    A February 6, 1995, MRI of Demarco's lumbar spine revealed: degeneration of the L5-S1 disc with a moderate bulging disc at L5-S1 but no evidence of focal disc herniation.  (R. 160).

On August 25, 1995, Dr. Boury examined Demarco.  (R. 200-01).  Dr. Boury's impression was a "history suggestive of a bilateral S1 radiculopathy, worse on the right. Rule out central herniated disc at the level of L5-S1, more so to the right side."  (R. 201). Dr. Boury recommended a diagnostic lumbar myelogram and CT scan and follow-up visit. Id.  A September 1, 1995 lumbar myelogram revealed a small anterior extradural defect at the level of L-4/L-5 and possibly also L-5/S-1.  (R. 192).  A CT scan the same day showed: diffuse bulge of the disc at L-3/L-4 which mildly effaces the thecal sac centrally and hypertrophy of the ligamentum flavum; diffuse bulge of the annulus at L-4/L-5 which mildly effaces the thecal sac centrally and hypertrophy of the ligamentum flavum; and very mild central bulge of the annulus at L-5/S-1.  (R. 193).  After reviewing the September 1, 1995 diagnostic pictures, Dr. Boury opined that Demarco would not benefit from surgical decompression at that time.  (R. 199).

On November 17, 1997, Dr. Henry H. Chan reviewed an MRI of Demarco's lumbar spine. (R. 161). Dr. Chan's impression was: "sublagametous bulging of the L5-S1 disc. Suggestion of L4-5 disc herniation on the left. Clinical correlation or additional T2 axial images might be of benefit." Id. Also on November 17, 1997, Dr. H. Boury examined Demarco and examined the MRI of the same day. (R. 170-72; 198). Dr. Boury's report states:

> [Demarco] bent over to essentially tie his shoes, when he hurt his back. He felt twinge of pain in the lower aspect of his lumbosacral spine. Over the next 24 hours, the pain started radiating down to his buttocks bilaterally, worse down the right side, all the way to the calf as well as into the feet. There was occasional numbness and tingling. While he is not aware of any paralysis in his lower extremity, he was telling me that it is "very, very hard just to walk."

(R. 170). Demarco reported that his current pain was very severe. Bed rest did improve the pain. (R. 198). Dr. Boury's impression was herniated disc at the level of L4-5, central, associated with central lumbar spinal canal stenosis; herniated disc at the level of L5-S1, central; bilateral lumbar radiculopathy of L5 and/or S1, worse on the right side; and congenital, narrow, lumbar spinal canal. (R. 171). Dr. Boury recommended that Demarco be admitted for a diagnostic myelogram and CT scan. Id.

On November 18, 1997, Dr. Boury performed a myelogram on Demarco which showed an area of stenosis opposite the level of L4-L5. (R. 181, 188). A CT scan was performed following the myelogram. (R. 186). The CT scan showed a central herniated disc at the level of L4-L5 associated with hypertrophy of the facet and the ligaments causing the picture of an hour-glass deformity and stenosis. (R. 181). The myelogram and the CT scan also showed a central mild bulge and/or herniated disc at the level of L5-S1. The CT scan showed a herniated disc present at T11-T12 which compressed the thecal

sac centrally and extended more towards Demarco's right side causing some associated foraminal stenosis. Id. After seeing Demarco in a follow-up visit and reviewing the myelogram and CT scan, Dr. Boury recommended decompressive lumbar laminectomy at L4 and L5 bilaterally, as well as microlumbar discectomy at the level of L4-L5 on the right side. Id; see also (R. 197).

On December 5, 1997, Demarco was admitted to Central Dupage Hospital for back surgery. (R. 162-169). The preoperative diagnosis was congenital, lumbar spinal canal narrowing, herniated disk at the level of L4-L5, central, more so to the right side, and rule out herniated disk at the level of L5-S1. (R. 165). The postoperative diagnosis was congenital narrow spinal canal, central herniated disk at the level of L4-L5, and herniated disk at the level of L5-S1, left. Id. He was discharged following surgery on December 7, 1997. On December 15, 1997, Dr. Boury saw Demarco for his first postoperative visit. (R. 196). Dr. Boury stated Demarco was "doing extremely well. His incision is healing nicely, the staples were removed. He is taking just one pain killer per day and has lost 10 pounds." Id. Dr. Boury asked Demarco to come back in about six weeks. Id.

On January 21, 1998, Demarco was seen at the Central DuPage Hospital emergency room complaining of nausea and tingling in both hands. (R. 178). A chest x-ray was normal. (R. 179). On January 26, 1998, Demarco reported to Dr. Boury that he still had some morning stiffness which was to be expected following surgery. (R. 195). Dr. Boury thought Demarco's back was "coming along fairly nicely." Id.

On June 29, 1998, Dr. Boury saw Demarco for a follow-up visit. (R. 194). Demarco reported being "very pleased with the way things are going with the resolution of his bilateral buttock pain." Id. Demarco told Dr. Boury that he was back working in his garage

repairing lawn mowers.  Demarco did complain about occasional localized back pain which responded primarily to the use of some Tylenol with Codeine.  Id.  Dr. Boury gave him a prescription for 25 tablets of Tylenol with Codeine #3, no refills and indicated he would see him on a per needed basis.  Id.

On September 1, 2000, Dr. Dean Thomas Velis examined Demarco for the SSA. (R. 206-10).  Demarco reported chronic and persistent back pain and spasms, occasionally radiating to the buttocks region.  (R. 206).  Dr. Velis noted that Demarco was cooperative, polite, and had a sincere demeanor but appeared to be in "moderate distress."  (R. 207). Dr. Velis' clinical impression was:

> Low Back Pain that required surgery in 1997 for congenital lumbar canal narrowing, herniated disc at the level of L4-L5, congenitally narrowed spinal canal, central herniated disc at the level of L4-L5, and herniated disc at the level of L5-S1 on the left.  Today the claimant is in moderate distress with ambulation and mechanical motion of the lumbar spine.  His range of motion is limited.  He has a positive straight leg raise test and he has marked paravertebral muscle tenderness and spasms.  He has occasional radicular symptoms radiating to the gluteal region.  An x-ray is being requested.

(R. 208).  A September 1, 2000 radiological evaluation of the lumbosacral spine revealed minimal degenerative changes with occasional osteophytes at the vertebral endplates, findings more prominent at the L3-L4 levels, slight sclerosis noted at the lower lumbar spine, laminectomy at L4 and L5, minimal narrowing at the L4-L5 and L5-S1 intervertebral spaces.  (R. 211).

In September 2000, a Physical Residual Functional Capacity Assessment (PRFC) was completed by William Bucci, DCS, and approved by Dr. Bruce Donnelly.  (R. 212-19); see also (R. 105).  The PRFC indicates that Demarco could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-

hour workday, sit about 6 hours in an 8-hour workday, push and/or pull unlimited, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and never climb ladders, ropes, or scaffolds. (R. 213-14). Dr. Donnelly found no manipulative, visual, communicative, and environmental limitations, except no exposure to hazards such as machinery, heights, etc. (R. 217). The additional comments were: "48 year old claimant post laminectomy L4-L5. Has residual complaints of pain. ROM is decreased to 30 degrees. SLR +30. However, there is no motor loss or reflex abnormalities. Ambulation is unassisted. There is a medial basis for the claimant's pain. The claimant's impairment does not meet or equal the level of severity described in the Listing of Impairments." (R. 219).

Dr. S. Latchamsetty completed a second Physical Residual Functional Capacity Assessment on March 12, 2003. (R. 229-36). Dr. Latchamsetty found that Demarco could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, must periodically alternate sitting and standing to relieve pain or discomfort, unlimited push and/or pull, frequently climb ramps, stairs, ladders, ropes, scaffolds, frequently balance, occasionally stoop, frequently kneel, and occasionally crouch and crawl. (R. 230-31). Dr. Latchamsetty found no manipulative, visual, communicative, or environmental limitations. (R. 232-33). Dr. Latchamsetty noted: "Evidence shows claimant responding to medication." (R. 234).

Between March 25, 2002 and July 16, 2004, Demarco was seen nineteen times by Dr. Manual P. Blas at the Melrose Park Pain Management Center for low back pain. (R. 220-28; 239-51; 263-81; 287-88). On August 27, 2003, Dr. Manuel P. Blas submitted a consultative report regarding Demarco's condition. (R. 238). Dr. Blas stated that he first

saw Demarco on March 25, 2002. Id. Dr. Blas indicated that since Demarco's 1997 lumbar laminectomy, "he has never had a pain free state but continued to have persistent pains of the lower back and lower extremities." Id. Dr. Blas' diagnosis was: radiculitiis, chronic, and irritative L4-L5, L5-S1 bilateral secondary to epidural adhesions. Secondary diagnosis is Postlaminectomy Syndrome, lumbar." Id. Dr. Blas recommended two treatment choices: (1) adhesiolysis utilizing the Racz Technic with the Racz Catheter which is a non-operational approach or (2) a non-invasive approach which will only include pain medications. Id. Demarco chose the non-invasive approach and began pain medication. Dr. Blas indicated that he sees Demarco approximately every other month. Id.

An April 6, 2004 x-ray of Demarco's right elbow revealed degenerative changes about the elbow with join space narrowing, hypertrophic changes and bony density on the lateral view. (R. 261, 285, 286). On April 21, 2004, Demarco saw Dr. Kellen Choi complaining of right elbow stiffness and decreased range of motion as well as pain. (R. 259-60; 283-84). Dr. Choi noted that Demarco was in "no distress." (R. 259). Dr. Choi also noted weak grip, sensation of numbness and tingling, and hyperflexion localized to the radial three digits. (R. 260). After examination and review of x-rays, Dr. Choi's impression was osteoarthritis of the right elbow and median nerve neuropathy. Id. Dr. Choi's diagnosis was degenerative joint disease of the right elbow. Id. Dr. Choi recommended EMG studies and a consultation with Dr. Santucci. Id. Demarco deferred treatment at that time. Id. Dr. Choi indicated that Demarco's activity can be as tolerated with excluding heavy lifting greater than 10-15 pounds or manual labor. Id. Dr. Choi directed Demarco to follow-up on an as needed basis. Id.

### C.      Vocational Expert's Testimony

The Vocational Expert ("VE") testified that all of Demarco's past relevant work is in the medium strength category. The VE stated that a hypothetical person with Demarco's work experience, education, and age and the residual functional capacity to do the occasional and frequent lifting requirements of medium work, the ability to stand and/or walk for about six hours in an eight-hour workday, the ability to sit with the normal work break with the ability to periodically alternate sitting and standing to relieve discomfort, and postural limitations precluding more than occasional stooping, crouching, and crawling could perform Demarco's past relevant work as a small engine mechanic and a tractor trailer truck driver. (R. 330-32).

The VE further testified that a hypothetical person with Demarco's work experience, education, and age and the residual functional capacity to lift and carry no more than light work with no more than occasional balancing, stooping, kneeling, crouching, crawling and climbing of ramps and stairs would not be able to perform any of Demarco's past relevant work but would be able to perform a wide range of unskilled, light work such as fast food worker and hostess or greeter and unskilled, sedentary work as a security guard/surveillance system monitor. (R. 333-34). The VE testified that his answer would be the same if a right arm impairment limiting the ability to extend the right arm straight out and restricting lifting to no more than 10 pounds with the right arm was added to the last hypothetical. (R. 334). If the VE accepted Demarco's description of his capabilities and limitations (i.e. walk only a block; sitting and standing ability varies; after taking medications, must sit down because becomes zombie-like with zero concentration; limited use of right-arm; cannot bend at the waist; cannot reach with his right hand; sleeping during the day three to four times a week, and pain in both legs), he would find Demarco

unemployable.  (R. 335).

On cross-examination, the VE testified that if the hypothetical individual was not able to maintain concentration through a full eight-hour day, he would be unable to perform any job.  (R. 340).  If the individual had to periodically alternate between sitting and standing, the VE opined that the fast food job would be precluded.  (R. 341).  If the individual is unable to lift and carry 20 pounds in a workday due to pain, he would be precluded from all light work jobs including the fast foot job.  (R. 345).  Finally, the hypothetical individual would be precluded from the fast food job, if he was limited to bending less than occasionally.  (R. 345).

### D.    ALJ's Decision

The ALJ denied Demarco's claim at step five, finding that he retained the residual functional capacity to perform a restricted range of medium work with the ability to alternate between sitting and standing and no more than occasional stooping, crouching, and crawling.  (R. 33).  The ALJ found Demarco's allegations of disabling symptoms and limitations not credible because his limited daily activities could not be objectively verified with any reasonable degree of certainty, the "relatively weak medical evidence," the part-time work activity after the alleged onset of disability, and the failure to follow-up on treatment recommendations by his treating physicians.  (R. 32-33).

## III.    DISCUSSION

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Demarco's claim at Step 5, finding that by September 30, 2002,

Demarco retained the residual functional capacity to perform a significant range of medium work. Demarco raises three main challenges to the ALJ's decision: (1) the ALJ failed to properly evaluate Listing 1.04; (2) the ALJ's credibility determination is not supported by substantial evidence; and (3) the ALJ improperly evaluated Demarco's residual functional capacity. Demarco also argues that the Appeals Council erred by not reversing the ALJ's credibility determination. Demarco's arguments do not warrant reversal or remand.

A.    Listing 1.04

Demarco first challenges the ALJ's finding that his back condition did not equal in severity Listing 1.04. "The Listing describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). Listing 1.04(A) reads:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord qualifies as a disability if there is "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Demarco bears the burden of demonstrating that his back condition meets all of the listing requirements. Id.

The Commissioner argues that Demarco cannot meet the threshold requirements of Listing 1.4. The Commissioner says that after Demarco's surgery, he no longer had any spine disorder which is required to meet the threshold requirements of Listing 1.04; he no longer had a herniated disc and there was no evidence of spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture.

Demarco responds that the listing only gives examples of disorders and is not an exclusive list of disorders.

The ALJ's finding step three is supported by substantial evidence. The Court agrees with Demarco that the impairments listed in 1.04 are examples of disorders of the spine and not an exclusive list, but Demarco has not met his burden of demonstrating that his back condition satisfies the requirements of Listing 1.04A. Demarco points to Dr. Blas' records as contradicting the finding of the ALJ that he did not meet Listing 1.04A. However, all but one of the records Demarco relies on pre-date his surgery which corrected his herniated discs. In the Court's view, an inference from page 228 of the record (the one record relied on by Demarco which post-dates his surgery) that Demarco suffered from a herniated disc post-surgery is unwarranted. That record merely indicates that an MRI "taken before surgery" indicated herniated nucleus pulposus (HNP) at the level of L4-5 and L5-S1. (R. 228). The ALJ properly considered Demarco's post-surgery condition in assessing whether he met Listing 1.04. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00I (stating "[t]reatments for musculoskeletal disorders may have beneficial effects or adverse side effects. Therefore, medical treatment (including surgical treatment) must be considered in terms of its effectiveness in ameliorating the signs, symptoms, and laboratory abnormalities of the disorder . . . . ").

Moreover, Demarco's back surgery had a satisfactory result. At Demarco's first postoperative visit following surgery, Dr. Boury stated that Demarco was "doing extremely well." (R. 196). Dr. Boury indicated that Demarco was taking just one pain killer per day. Id. He directed Demarco to return in six weeks. Id. Demarco saw Dr. Boury again in January 1998. (R. 195). Dr. Boury indicated that Demarco was "coming along fairly nicely"

and stated that Demarco's morning stiffness was expected following surgery. Id. Dr. Boury suggested flexion exercises with a therapist. Id. Within seven months after surgery, Demarco reported that he was "very pleased" with the resolution of his bilateral buttock pain. (R. 198). Thereafter, Demarco sought no treatment for back pain for almost four years. (R. 228). When Demarco sought treatment again for his back pain, he was not diagnosed with a spine disorder which meets the Listing of 1.04. (R. 220-28; 239-51; 263-81; 287-88). The Court also has the benefit of Dr. Blas' post-surgery August 27, 2003 report regarding Demarco's condition. Dr. Blas' diagnosis at that time was radiculitiis, chronic, and irritative L4-L5, L5-S1 bilateral secondary to epidural adhesions. (R. 238). His secondary diagnosis was Postlaminectormy Syndrome, lumbar. Id. Again, none of Dr. Blas' post-surgery diagnoses satisfy the spine disorders of Listing 1.04.

References in Demarco's medical records to radiculitiis (inflammation of a spinal nerve root) at L4-5 and L5-S1 bilaterally and post laminectomy syndrome after his surgery do not change the conclusion that Demarco failed to carry his burden at step three. Although Listing 1.04 does not define the term "disorders of the spine," another section of the listings regulations which cross-references § 1.04 states that disorders of the spine "result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots (including the cauda equina) or spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00K. There is no indication in Demarco's post-surgery medical records that he suffered from a "distortion of the bony and ligamentous architecture of the spine" during the relevant time frame. The state agency physicians concluded that Demarco did not suffer from a back impairment meeting or equaling Listing 1.04. (R. 212-19; 229-36). The ALJ may properly rely upon the opinion

of state agency physicians to determine medical equivalence.  Flener v. Barnhart, 361 F.3d 442, 448 (7th Cir. 2000) (stating "it is appropriate for an ALJ to rely on the opinions of [state agency] physicians and psychologists who are also experts in social security disability evaluation."); 20 C.F.R. § 404.1527(f).  There is no post-surgery medical opinion in the record contradicting the state agency physicians' opinions that Demarco does not meet Listing 1.04.  Substantial evidence supports the ALJ's finding that Demarco's back condition does not meet or equal the requirements of Listing 1.04.

Demarco also argues that the ALJ's failure to explain and discuss why Listing 1.04 was not met requires reversal and remand.  The Seventh Circuit has held that "an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis' may require a remand."  Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006).  In his opinion, ALJ Mondi stated that Demarco's vertebrogenic disorder was "severe" within the meaning of the Regulations "but did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4."  (R. 31).  ALJ Mondi should have mentioned Listing 1.04 by name, but his failure to so does not require a remand here.  Demarco's attorney referred in his pre-hearing memorandum and in his argument at the hearing only to Listing 1.04.  (R. 18-23, 296).  Demarco does not argue that any other listing is applicable to him.  The Court also notes that current Listing 1.04A superceded Listing 1.05C. Listing 1.05C dealt with "other vertebrogenic disorders," and the ALJ specifically found that Demarco had a "vertebrogenic disorder."  (R. 31).  Given that the only references in the record were to Listing 1.04 and a "vertebrogenic disorder," the Court is comfortable concluding that the ALJ applied the appropriate listing even though he failed to expressly mention it by name in his opinion.  Rice v. Barnhart, 384 F.3d 363,

369-70 (7th Cir. 2004).

The ALJ's analysis of Demarco's back condition was also not perfunctory. In determining whether the ALJ's analysis was sufficient at step three, it is appropriate to consider the ALJ's decision as whole. Rice, 384 F.3d at 370 n.5 (holding it is proper to read the ALJ's decision as a whole when determining whether the ALJ's decision at step three was supported by substantial evidence "because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five."). The ALJ discussed Demarco's back injury in December 1995 and treatment. (R. 31). He noted Demarco's reinjury of his back in November 1997, diagnosis of disc herniations at L4-5 and L5-S1 with a congenitally narrow spinal canal, and surgery in December 1997. Id. The ALJ further noted that Demarco continued to have back pain and in September of 2000 was observed to have decreased lumbar range of motion and a positive straight leg raising test at 30 degrees. Id. The ALJ discussed Demarco's treatment for back and radiating leg pain with Dr. Blas at the Melrose Park Pain Management Center beginning in March 2002. The ALJ summarized Dr. Blas' opinion that adhesions from the back surgery were most likely causing Demarco's back pain. Id. The ALJ noted Demarco's use of narcotics. Id. The ALJ also relied on the state agency physicians' finding that Demarco was not disabled. (R. 33). Because the ALJ's decision was sufficiently detailed to trace his "path of reasoning," his failure to reference Listing 1.04 by name in his decision is harmless. Rice, 384 F.3d at 370 (quoting Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)). (noting that the ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence.").

**B.    Credibility Determination**

Demarco next contends that the ALJ failed to properly analyze his credibility under Social Security Ruling 96-7p. The ALJ found Demarco's allegation of disabling pain not credible because his activities of daily living were not objectively verifiable to any reasonable degree of certainty and the medical evidence was "relatively weak." (R. 32). Demarco contends that the ALJ's credibility determination was erroneous because his testimony regarding his pain and limitations was supported by substantial medical evidence.

Social Security Ruling 96-7p states that ALJs must provide "specific reasons" for a credibility finding. ALJs must also evaluate the credibility of the claimant's testimony about his symptoms in light of seven factors: (1) daily activities, (2) the location, duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medication, (5) treatment, (6) other measures used to relieve the pain, and (7) other factors concerning functional limitations. SSR 96-7p. An ALJ's credibility determination is entitled to "special deference" and will be reversed only if it is "patently wrong." Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ gave specific reasons for his credibility finding, and substantial evidence supports his finding. The ALJ provided sufficient support for his finding that Demarco was not credible regarding his allegation of total disability. First, the ALJ properly considered the objective medical evidence as one factor in making the disability determination. 20 C.F.R. § 404.1529(c); see also SSR 96-7p (stating that "objective medical evidence 'is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of' an individual's symptoms and the effects those symptoms may have on the

individual's ability to function."). The ALJ noted that Demarco's description of the severity of his limitations and pain was inconsistent with the medical record. (R. 32). None of the medical experts concluded that Demarco had disabling limitations prior to his last date insured. In fact, as the ALJ noted, there is no doctor's opinion contained in the record which indicates greater limitations than those found by the ALJ. (R. 33). Dr. Blas did not suggest limitations on Demarco's capability to perform work.

Demarco argues that the ALJ's finding that the medical evidence was "relatively weak" is unsupported by the record, but Demarco again mostly cites diagnostic studies prior to his corrective surgery. See Pl's Memo. At 9. None of the remaining medical records Demarco relies on support his claim of disabling limitations and pain. See (R. 206-08, 211, 219, and 253-54). For example, a September 1, 2000 x-ray of Demarco's lumbosacral spine revealed only minimal degenerative changes with occasional osteophytes at the vertebral endplates, slight sclerosis at the lower lumbar spine, and minimal narrowing at the L4-L5 and L5-S1 intervertebral spaces. (R. 211). Although a state agency physician found that there was a medical basis for Demarco's pain, he also found that there was no motor loss or reflex abnormalities, ambulation was unassisted, and that Demarco could perform the exertional requirements of light work. (R. 219). While Demarco undoubtedly does experience some back pain, substantial evidence supports the ALJ's finding that such pain is not disabling. Demarco need not be pain free to have the ability to engage in substantial gainful employment. See Gossett v. Bowen, 862 F.2d 802, 807 (10th Cir. 1988).

Contrary to Demarco's assertion, the ALJ did not discredit his testimony regarding his subjective symptoms merely because they were unsupported by the objective medical

evidence. Along with the objective medical findings, the ALJ also considered Demarco's treatment efforts including his failure to follow-up on treatment recommendations by his treating physicians, Demarco's part-time work activity after the alleged onset of disability, and the lack of evidence corroborating Demarco's allegations.

The ALJ properly considered Demarco's treatment efforts in assessing credibility. (R. 32). Social Security Ruling 96-7p instructs an ALJ to consider many factors, including the treatment the individual has received and the effectiveness of medication, in assessing a claimant's credibility. See SSR 96-7p (noting that "[p]ersistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications . . . generally lend support to an individual's allegations of intense and persistent symptoms."). The ALJ found Demarco's complaints that he was disabled by his pain less credible because Demarco failed to follow Dr. Blas' recommendation to undergo the RACZ treatment.[2]

Pursuant to Social Security Ruling 96-7p, the ALJ could rely on Demarco's failure to follow Dr. Blas' recommended treatment as long as he considered Demarco's explanation for his non-compliance. At the hearing, Demarco testified that he did not want to undergo the RACZ technique because "it's a full blown operation" and he did not "want to be opened up again." (R. 315-16). Although the ALJ did not specifically so state, it is obvious from the ALJ's determination that he rejected Demarco's explanation for his refusal to undergo the procedure. The ALJ's rejection of Demarco's explanation is supported by substantial evidence. Demarco's explanation at the hearing is incosistent with other

---

[2] "RACZ technique adhesiolysis is a new technique where the patient receives an injection into the spine to reduce scar tissue and swelling from the epidura space of the spine." Def's Memo. at 4 n.1.

evidence in the record. First, the RACZ technique is not a "full blown operation." As Dr. Blas advised, it is a "non-operative approach." (R. 238). Contrary to his explanation at the hearing, Demarco told Dr. Blas that he did not want to undergo the procedure because he had a phobia of hospitals and needles. (R. 224). The Commissioner's attorney also correctly points out that Demarco never mentioned to his back surgeon that he had a phobia of hospitals or needles.

Demarco challenges the ALJ's reliance on his failure to undergo the RACZ procedure recommended by Dr. Blas because the ALJ failed to consider whether the treatment was expected to restore his ability to work. Demarco's argument is premised on 20 C.F.R. § 404.1530. Section 404.1530(a) provides that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." It was unnecessary for the ALJ to make a finding regarding whether the RACZ treatment was expected to restore Demarco's ability to work because the ALJ did not deny Demarco's application on the basis of his failure to comply with that treatment. Rather, the ALJ found that Demarco's non-compliance with the recommended RACZ treatment suggested that his complaints of disabling pain were not credible. (R. 32-33). The ALJ appropriately considered Demarco's non-compliance in making his credibility assessment.

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

> On the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.

SSR 96-7p. Because the ALJ did not reject Demarco's claim because he failed to follow a prescribed course of treatment but properly relied on Demarco's failure to undergo the RACZ treatment as one factor in assessing the credibility of his subjective complaints, 20 C.F.R. § 404.1530 did not come into play in this case.

Demarco also argues that the ALJ erred in failing to evaluate the side effects of his medications as required by SSR 96-7p. Demarco testified that he takes several different kinds of medication. (R. 308). Demarco maintains that his medication causes sleepiness and a loss of concentration. The ALJ did consider Demarco's medication side effects. He noted that Demarco uses potent narcotic medications which he alleges provide little relief and have incapacitating side effects. (R. 32). The ALJ implicitly rejected Demarco's claim of severe/debilitating side effects of his medications. The ALJ's rejection of Demarco's testimony as to the side effects is supported by substantial evidence. With one exception, the record includes no evidence that Demarco consistently complained to his doctors about severe side effects. On only one occasion did Demarco report being sleepy from Oxycontin and Zanaflex, and as a result, Dr. Blas changed the medication to Percocet. (R. 226, 238). The ALJ did not err in discrediting Demarco's testimony regarding side-effects for his medications.

The ALJ also considered Demarco's description of his daily activities and statements regarding his pain and limitations. (R. 32 citing R. 125-27 and 143-44). The ALJ noted the discrepancy between Demarco's assertions that he could not engage in substantial

gainful activity and his ability to work part-time repairing small engines and plowing snow. (R. 32). The ALJ also permissibly considered the lack of corroborating evidence regarding his allegation of pain and restricted activities. <u>See</u> SSR 96-7p (directing the ALJ to consider the credibility of the claimant in light of "the entire case record, including . . . statements and other information provided by . . . other persons about the symptoms and how they affect the individual."). An ALJ must at least build "an accurate and logical bridge form the evidence to [his] conclusion," and ALJ Mondi did so here. <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1176 (7th Cir. 2001).

### C. Residual Functional Capacity Determination

Demarco challenges the ALJ's RFC assessment. The RFC is a description of those work activities a claimant can perform despite his limitations. <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1178 (7th Cir. 2001). In assessing the claimant's RFC, the ALJ must consider both the relevant medical and nonmedical evidence in the record. <u>See</u> 20 C.F.R. § 416.945(a)(3). The ALJ determined that Demarco retained the RFC to perform a significant range of medium work. (R. 33, 34).

Demarco contends that the ALJ's RFC finding is erroneous because he failed to follow Social Security Ruling 96-8p which states in relevant part: "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." Demarco argues that the ALJ failed to adequately explain how he determined Demarco's RFC.

"SSR 96-8p requires an ALJ to individually assess the exertional (lifting, carrying, standing, walking, sitting, pushing, and pulling), and non-exertional (manipulative, postural,

visual, communicative, and mental functions) capacities of the claimant in determining a claimant's RFC." Delgado v. Commissioner of Social Security, 2002 WL 343402, at *4 (6th Cir. March 4, 2002). However, there is a distinction between what an ALJ must consider and what an ALJ must articulate in the opinion. Lawson v. Apfel, 2000 WL 683256, *3 (S.D. Ind. May 25, 2000); Delgado, 2002 WL 343402, at *5 (noting Third Circuit opinion which "distinguished between what an ALJ must consider and what an ALJ must discuss in a written opinion."). Social Security Ruling 96-8p "does not require an ALJ to discuss all of a claimant's abilities on a function-by-function basis. Rather, an ALJ must explain how the evidence supports his or her conclusions about the claimant's limitations and must discuss the claimant's ability to perform sustained work activities." Lawson, 2000 WL 683256 at *4.

Here, ALJ Mondi reviewed the evidence in the record when he determined Demarco's RFC and sufficiently explained how he arrived at his conclusions. The ALJ's RFC determination is supported by substantial evidence. The ALJ initially noted that Demarco's back problems began after a December 1995 work-related lifting injury. (R. 31). Demarco was then treated conservatively with medications, physical therapy and epidural steroid injections. Id. The ALJ noted that Demarco did reasonably well until November 1997 when he had an acute onset of low back pain that radiated into his buttocks and legs, extending to his feet. Id. The ALJ stated that Demarco returned to Dr. Boury and an MRI revealed disc herniations at L4-5 and L5-S1 with a congenitally narrow spinal canal warranting a decompressive laminectomy on December 5, 1997. Id. The ALJ noted that Demarco continued to have back pain after his surgery and was seen by Dr. Velis in September of 2000. Id. Dr. Velis reported decreased lumbar range of motion and a

positive straight leg raising test at 30 degrees.  Id.

The ALJ also discussed Demarco's treatment for back and radiating leg pain with Dr. Blas at the Melrose Park Pain Management Center beginning in March 2002, initially monthly but later less often.  (R. 31).  The ALJ noted that Dr. Blas indicated that adhesions from the back surgery were most likely causing back pain.  Id.  Dr. Blas further indicated that the adhesions could be removed, but Demarco declined and was treated with oral medications.  Id.  The ALJ stated: "Despite reportedly worsening pain and adverse side effects from his prescribed narcotics, he had repeatedly rejected recommendations for a non-operative approach to remove the adhesions."  Id.

The ALJ also considered Demarco's complaints of right elbow pain.  (R. 32).  The ALJ discussed Dr. Choi's observation in April 2004 that Demarco had decreased range of motion in his right elbow, some discomfort on terminal flexion, and mild grip weakness.  Id. The ALJ noted that Demarco was diagnosed with osteoarthritis of the elbow with median nerve neuropathy.  Id.  Dr. Choi advised Demarco to limit lifting to no more than 15 pounds. Id.  The ALJ noted that Dr. Choi's findings contrast with Dr. Velis' observation in September 2000 that Demarco was able to grasp and manipulate with both hands, had full range of motion and a 5/5 motor strength in both arms and both legs.  Id.

In assessing Demarco's residual functional capacity, the ALJ also considered Demarco's description of his daily activities.  The ALJ found Demarco's allegations regarding his daily activities not credible because they were not verified to any reasonable degree of certainty, the medical evidence did not support the degree of limitation alleged, Demarco engaged in part-time work activity after the alleged onset of disability extending well into 2003, and Demarco's failed to follow recommendations by Dr. Blas regarding

removal of his back adhesions and Dr. Choi regarding an EMG and referral to Dr. Santucci. (R. 32-33). The ALJ also based his assessment of Demarco's RFC on the state agency physicians' function-by-function analysis of his limitations. (R. 33). Finally, the ALJ properly noted that no treating physician recommended any restrictions on or prior to September 30, 2002. <u>See</u> <u>Haynes v. Barnhart</u>, 416 F.3d 621, 631 (7th Cir. 2005) (noting "[n]o treating physician recommended that [claimant] take days off from work for treatment or rest.").

Demarco acknowledges that the ALJ found he needed the ability to alternate between sitting and standing to relieve pain or discomfort but argues that the ALJ erred in failing to find how many minutes he needed to alternate between sitting and standing. Demarco is correct that the frequency of the sit/stand option was not explicitly set forth in the ALJ's RFC finding. However, the ALJ's hypothetical to the Vocational Expert included the ability to periodically alternate sitting and standing to relieve discomfort. (R. 330). An ability to periodically alternate sitting and standing to relieve pain or discomfort is supported by medical evidence in the record. (R. 230). Because the hypothetical question incorporated the periodic sit/stand option which was supported medical evidence in the record, the ALJ's failure to include the frequency of Demarco's need to alternate positions in his RFC finding is harmless.

Demarco also contends that the ALJ failed to address his limitations in standing and walking, limitations in concentration, and limitations due to his need to sleep during the day. The ALJ found that Demarco could perform a restricted range of medium work, subject to a need to alternate between sitting and standing, and a restriction against more than occasional stooping, crouching, and crawling. A full range of medium work "requires

standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." SSR 83-10. Demarco points out that he testified that he was unable to walk two blocks and that he could not stand or walk for two hours of an eight hour workday. Demarco testified that he needs to sleep three hours during the day and cannot concentrate when taking Oxycontin. (R. 317, 322). Because substantial evidence supports the ALJ's rejection of Demarco's allegations regarding standing and walking limitations, concentration limitation, and need to sleep during the day, the ALJ need not consider and include these subjective complaints in his RFC finding. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir.1997) (stating "[t]he ALJ should consider and discuss all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand.").

Finally, Demarco argues that the ALJ erred in failing to determine the onset date of his elbow pain and its limiting effects. Demarco cites SSR 83-20 in support of his argument. The "date of onset" is the "first day an individual is disabled as defined in the Act and the regulations." SSR 83-20. Where there is no finding of disability, SSR 83-20 is inapplicable. Key v. Callahan, 109 F.3d 270, 274 (6th Cir. 1997). Because the ALJ found that Demarco was not disabled before his insured status expired on September 30, 2002, the ALJ did not err in failing to determine the onset date of Demarco's elbow pain.

### D. Appeals Council

Demarco claims that the Appeal Council's failure to reverse the ALJ's credibility determination based on his refusal to undergo the RACZ treatment was erroneous. In his

appeal of the ALJ's decision, Demarco submitted additional evidence to the Appeals Council. (R. 9-14; 24-26). Demarco argues that the Appeal Council erred in finding his new evidence was not material.

Courts generally do no review the Appeals Council's decision to deny review of an ALJ's disability determination. Damato v. Sullivan, 945 F.2d 982, 988-89 (7th Cir. 1991). "[I]f the Appeals Council *denies* a request for review, the ALJ's decision becomes the final decision of the Secretary . . . and judicial review is available only for final decisions of the Secretary." Id. at 988 (emphasis in original). However, "[r]eview is possible only if . . . the Appeals Council's action rests on a mistake of law, such as a determination that the evidence submitted for the first time to the Appeals Council was not 'new' or 'material' within the meaning of the governing rules." Perkins v. Chater, 107 F.3d 1290, 1294 (7th Cir. 1997). The regulations require the Appeals Council to review additional evidence if the evidence is "new" and "material." 20 C.F.R. § 404.970(b).

Review of the Appeals Council's decision to deny review is not appropriate in this case. The Appeals Council did not find that the additional evidence submitted by Demarco was immaterial. The Appeals Council stated that it "considered the reasons you disagree with the decision in your representative's letter requesting review dated November 8, 2004, and in your representative's letters dated August 17, 2004 and August 19, 2005." (R. 5). It found that "this information does not provide a basis for changing the Administrative Law Judge's decision." The Appeals Council reviewed the new evidence submitted by Demarco but found there was no basis for changing the ALJ's decision. Id.

Because the Appeals Council reviewed Demarco's additional evidence in light of the entire record, it implicitly found Demarco's additional evidence to be both "new" and

"material." Alexander v. Barnhart, 2003 WL 21418244, at *8 (N.D. Ill. June 18, 2003); Binzen v. Barnhart, 2002 WL 31324061, at *6 (N.D. Ill. Oct. 16, 2002). "[O]therwise, it would have refused to consider it at all in denying the request for review." Alexander, 2003 WL 21418244, at *8. The Appeals Council did not commit an error of law when it failed to reverse the ALJ's credibility determination in light of the additional evidence, and this Court will not review its discretionary decision to deny review.

## CONCLUSION

For the reasons explained above, Plaintiff's Motion for Summary Judgment [20] is denied and Defendant's Motion for Summary Judgment [22] is granted. Pursuant to sentence four of 42 U.S.C. 405(g), the ALJ's decision is affirmed. The Clerk is directed to enter final judgment in favor of the Commissioner and against the Plaintiff in accordance with Rule 58 of the Federal Rules of Civil Procedure.

**E N T E R:**

_____

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: June 5, 2007**